UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JASON WEISTER,

    Plaintiff,

v.                                                  CASE NO. 8:21-cv-1250-SDM-AEP

VANTAGE POINT AI, LLC,

    Defendant.
_____/

**<u>ORDER</u>**

After texting "DEMO" in response to a radio spot touting VantagePoint AI's "artificial intelligence" stock trading software, Jason Weister received by text a hyperlink to register for a training webinar. Weister decided not to register but in the following months received from VantagePoint fifteen pre-recorded "ringless" voicemails that persisted in inviting Weister to register for other training webinars. During these training webinars, VantagePoint allegedly attempts to sell the artificial intelligence software. Weister sues under the TCPA and on behalf of a putative class.

In accord with the parties' joint litigation plan and before class discovery begins, VantagePoint moves (Doc. 29) for summary judgment on Weister's claim. Weister responds (Doc. 33) in opposition and VantagePoint replies (Doc. 36) in support of summary judgment.

## BACKGROUND

The following facts are either undisputed or construed in Weister's favor. VantagePoint sells "financial, technical analysis software, artificial intelligence, for retail [stock] traders." (Doc. 41-1 at 5) VantagePoint hosts live and webinar events to train traders to use VantagePoint's "artificial intelligence" software. (Doc. 41-1 at 2) To promote these training events, Trader Marketing Group, an affiliate of VantagePoint, purchases radio spots and transmits promotional texts and voicemails to consumers. (Doc. 41-1 at 3)

In December 2020, Trader Marketing Group ran a radio spot, which stated, "Text DEMO to 411411 to get what you need to stay ahead of market trends and find explosive moves before they happen," "Text DEMO to 411411 to find out how our technology can forecast market trends up to 3 days in advance with incredible accuracy," and "Text DEMO to 411411 and experience VantagePoint for free." (Doc. 36-2 at ¶ 4) After hearing the radio spot, Weister texted "DEMO" to 411411. (Doc. 33-1) In response, Weister received a text stating, "VP: START NOW! https://vpai.us/start-naw for a free online AI class or call 800-732-5407 during business hours ET. STOP to cancel." (Doc. 33-1) Weister decided not to attend the event and neither responded to the text nor entered information on the webpage.

From January through March 2021, Weister received fifteen pre-recorded "ringless" voicemails promoting training events hosted by VantagePoint. (Doc. 29-3 at 6) To transmit these "ringless" voicemails, Trader Marketing Group uses "Slybroadcast," a program that transmits in rapid succession two calls: the first call

to momentarily occupy the cellular telephone's line and the second call to bypass the occupied line, access the voicemailbox directly, and deliver the pre-recorded voicemail. (Doc. 33-4)

Although the scripts for VantagePoint's pre-recorded ringless voicemails differ, each script invites the recipient to attend a "free live training webinar" about VantagePoint's artificial intelligence software. (Doc. 29-1 at 11–25) Some of the scripts offer a "free AI forecast" for each webinar attendee. (Doc. 29-1 at 22) Also, each voicemail script informs the recipient of the option to cease voicemails by visiting a URL and entering both a name and a cellular telephone number. (Doc. 29-1 at 22) The following voicemail transcription represents the fifteen ringless voicemails Weister received.

> Hi, this is Harold calling from VantagePoint AI. I hope you're having great success in the financial markets. It's currently Friday, January 29th. The reason for my call is that you had recently expressed an interest in wanting to learn more about artificial intelligence trading. So I wanted to connect and extend an invitation and let you know that this afternoon at two o'clock Eastern time, we're actually doing a live webinar where we're going to discuss the two trading strategies using artificial intelligence to dominate 2021. To register, all you have to do is go to tradingeducation.com. That's tradingeducation.com. On this webinar, what we do is we're going to basically dissect every sector of the market so that you can see what the artificial intelligence has been forecasting. But most importantly, you're also going to get the opportunity to see what artificial intelligence is forecasting for the days and weeks ahead.
>
> All attendees to the webinar will also get a free AI forecast for whatever assets you're trading in your portfolio that you're unsure about and would like to see what the artificial intelligence is forecasting for them. So head on over to tradingeducation.com, get yourself registered. And I look forward to seeing you on the webinar very shortly. If for some reason you want to stop receiving these voicemail invitations, that's fine. Simply

> head on over to stopvoicemail.com and you will be remove[d] from the invitations list. Look forward to seeing you on the webinar very shortly. Thank you.

(Doc. 29-1 at 22) Although by texting "DEMO" to 411411 Weister consented to receive a text containing the registration link, Weister contends that the fifteen pre-recorded messages exceed Weister's consent and subject VantagePoint to liability under the TCPA.

## DISCUSSION

Enacted in 1991, the TCPA prohibits a person's "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or pre[-]recorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A). In other words, the TCPA subjects to liability a person who (1) uses an automatic telephone dialing system or a pre-recorded voice (2) to call (3) a cellular telephone (4) in the absence of an emergency purpose or the "prior express consent" of the recipient.

The TCPA offers no definition of "prior express consent" but delegates to the FCC the power to "prescribe regulations to implement" Section 227. In a 2012 order, the FCC requires "prior express consent" to take the form of "prior express *written* consent" if the call constitutes telemarketing or advertising. *In the Matter of Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830 (2012); 47 C.F.R. § 64.1200(a)(2). Before the 2012 FCC order, an oral acceptance or the provision of a telephone number furnished "prior express consent" for telemarketing,

- 4 -

advertising, and any other category of communication. But under the 2012 FCC order, the called party must furnish "prior express *written* consent," which means "an agreement, in writing, bearing the signature of the person called that clearly authorizes . . . advertisements or telemarketing messages." 47 C.F.R. § 64.1200(f)(9).

Although texting "DEMO" furnishes consent to receive the text containing the registration link, Weister claims that the fifteen pre-recorded ringless voicemails that followed constitute telemarketing for which Weister never furnished the "prior express *written* consent" required under the 2012 FCC order. Moving for summary judgment, VantagePoint argues (1) that by texting "DEMO" Weister invited the fifteen pre-recorded voicemails and thus suffered no injury-in-fact even in the absence of prior express *written* consent, (2) that the FCC's heightened form of consent violates the First Amendment, and (3) that the fifteen pre-recorded voicemails constitute neither telemarketing nor advertising. Weister opposes each argument.

I.     The standing challenge

Under Section 2 of Article III of the United States Constitution, the "judicial power" extends to "cases" and "controversies." To constitute a case or controversy, the plaintiff must demonstrate "standing" to sue. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (Alito, J.) ("The doctrine [of standing] developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood."). The "irreducible constitutional minimum of standing" comprises (1) an "injury-in-fact," (2) a "causal connection" between the plaintiff's injury and

the defendant's conduct, and (3) a likelihood that a favorable decision can redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (Scalia, J.).

An "injury-in-fact" requires "an invasion of a legally protected interest" that is "concrete and particularized" and that is "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. A concrete injury must "be '*de facto*'; that is, it must actually exist." *Spokeo*, 578 U.S. at 340 (citing BLACK'S LAW DICTIONARY 479 (9th ed. 2009)). Although a concrete injury is "real" and not "abstract," an "intangible harm" can constitute a concrete injury. *Spokeo*, 578 U.S. at 340–41. But an intangible harm causes a concrete injury (1) only if the intangible harm "has a close relationship to a harm" cognizable "traditionally" at common law and (2) only if the "judgment" of Congress "elevat[es] to the status of legally cognizable" an injury "previously inadequate in law." *Spokeo*, 578 U.S. at 341 (quoting *Lujan*, 504 U.S. at 578). However, the injury-in-fact requirement is "not automatically satisf[ied] . . . whenever a statute grants a right and purports to authorize a suit to vindicate it." *Spokeo*, 504 at 341. Even an intangible harm identified by Congress must have some analogue to a harm historically recognized at common law. For instance, a "bare procedural violation [of a statute], divorced from any concrete harm," cannot establish an injury-in-fact under Article III. *Spokeo*, 504 at 341 (reasoning that a credit report containing inaccurate marital and employment information causes no concrete injury absent disclosure to, and reliance by, a third party).

In *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019) (Branch, J.), the defendant contended that the transmission of a single, brief text message promoting discounted

- 6 -

legal services causes no concrete injury because the recipient spent only a few seconds reviewing and deleting the text. Although recognizing that a concrete injury "need only be an 'identifiable trifle,'" *Salcedo* finds that neither the judgment of Congress nor an analogue in the common law supports recognizing the receipt of a single, unsolicited text message as a concrete injury. *Salcedo*, 936 F.3d at 1167 (quoting *United States v. Students Challenging Reg. Agency Procs.*, 412 U.S. 669 (1973)).

Studying the legislative record, *Salcedo* finds no statement by Congress about the harms of unsolicited text messaging. *Salcedo*, 936 F.3d at 1169. Although text messaging was non-existent when Congress enacted the TCPA in 1991 and although the FCC by regulation has later expanded the TCPA to encompass text messaging, *Salcedo* correctly reads *Spokeo* to require a consideration of Congress's contemporaneous judgment — not a consideration of an agency's judgment and not speculation about how Congress might judge the harm attending a new technology. *Salcedo*, 936 at F.3d at 1170. Absent a congressional statement about the harm of an unsolicited text message, *Salcedo* reviews generally the congressional findings underlying the TCPA and confirms that the TCPA principally endeavors to eliminate "intrusive invasion[s] of privacy into the home." However, *Salcedo* finds that "by nature of their portability and their ability to be silenced, cell phones may involve less of an intrusion than calls to a home phone" and that "a single unwelcome text message will not always involve an intrusion into the privacy of the home in the same way that a voice call to a residential line necessarily does." *Salcedo*, 936 F.3d at 1170 (quoting Pub. L. No. 102-243, § 2, ¶ 5). Accordingly, *Salcedo* reasons that the judgment of

Congress "provides little support" for concluding that the receipt of a single unsolicited text constitutes a concrete injury. *Salcedo*, 936 F.3d at 1170.

Studying the common law, *Salcedo* considers whether the receipt of an unsolicited text message bears a "close relationship" to the possibly kindred torts of intrusion upon seclusion, conversion, and trespass to chattel.[1] Intrusion upon seclusion requires a "substantial" and "strongly object[ionable]" invasion into the "solitude or seclusion" of a person's private affairs. *Salcedo*, 936 F.3d at 1171 (citing Restatement (Second) of Torts § 652B). Although the Restatement (Second) of Torts recognizes that persistent telephone calls can intrude upon seclusion, *Salcedo* observes that a single unsolicited text message lacks — by definition — the "degree" of persistence to transform a single solicitation into a harassing intrusion. *Salcedo*, 936 F.3d at 1171 (citing Restatement (Second) of Torts § 652B, cmt. d (finding "liability "only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff.")).

Unlike the single text received in *Salcedo*, Weister received fifteen voicemails, each of which invited Weister to register for a training webinar. Although a single communication lacks — by definition — a harassing or hounding quality, the receipt of fifteen voicemails yields a qualitative change from the "fleeting" annoyance in *Salcedo* to conduct bearing a "close relationship" to the hounding and harassment

---

[1] *Salcedo* also compares the receipt of an unsolicited text message to the torts of trespass and private nuisance but finds no analogy because the unsolicited text invades no interest in real property. *Salcedo*, 936 F.3d at 1171.

- 8 -

actionable at common law. *Spokeo*, 136 S. Ct. at 1549; *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1270 (11th Cir. 2019) ("The receipt of more than one unwanted telemarketing call made in violation of the provisions enumerated in the TCPA is a concrete injury that meets the minimum requirements of Article III standing.").

Attempting to avoid this straightforward application of *Salcedo* and *Cordoba*, VantagePoint argues that, because Weister "invited" communication from VantagePoint by texting "DEMO" to 411411, Weister suffered no injury-in-fact by receiving the fifteen voicemails. Although the analysis of standing often overlaps with the analysis of the merits, in this instance the analyses remain distinct. In an action under the TCPA, consent functions as an affirmative defense to liability and not "as an issue of constitutional standing." *Reese v. Marketron Broad. Sols.*, Inc., No. CV 18-1982, 2018 WL 2117241, *2 (E.D. La. May 8, 2018) (collecting cases). Regardless, Weister's one-time text of "DEMO" in response to the radio spot naturally invited a one-time registration text from VantagePoint — not fifteen voicemails "inviting" Weister to attend a training webinar. *Daniel v. Five Stars Loyalty, Inc.*, No. 15-CV-03546-WHO, 2015 WL 7454260 (N.D. Cal. Nov. 24, 2015) ("[A] text sent solely for the purpose of allowing the recipient to complete a registration process that he or she initiated shortly before receiving the text is not telemarketing."). Under prevailing precedent, Weister demonstrates standing to sue under the TCPA.

II.   The First Amendment challenge

   a.   The Hobbs Act

VantagePoint contends that the FCC's requiring "prior express consent" for informational communications but requiring "prior express *written* consent" for telemarketing and advertising communications constitute a content-based restriction violative of the First Amendment.  In response, Weister argues that the Hobbs Act forecloses in the district court a challenge to the FCC's implementation of the TCPA.  In reply, VantagePoint contends that the Hobbs Act cannot preclude a district court's resolving an as-applied challenge under the First Amendment.

The Hobbs Act, 28 U.S.C. § 2342, empowers the federal courts of appeals with the "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity" of "all final orders of" the FCC, among other agencies.  However, under 28 U.S.C. § 2344, a party "aggrieved" by a "final order" must petition for review not later than sixty days after entry of the final order.  Under 28 U.S.C. § 2348, the Attorney General "is responsible for and has control of the interests of the Government," and the agency may appear "as of right."

An informed observer might suppose that the Hobbs Act's jurisdictional bar extends only to the pre-enforcement, direct review of the validity of a final order of the FCC.  Further, the observe might suppose that the jurisdictional bar has no application in private litigation — perhaps years after the final order — in which a private party endeavors to bind a private adversary to the FCC's interpretation of the TCPA.  After all, the observer might suppose, only an energetic and sophisticated

- 10 -

party can remain abreast of the FCC's relentless and elaborate stream of final orders, divine whether a proposed order might — immediately or prospectively — impede the party's interest, and within sixty days retain counsel, resolve to litigate against the Attorney General and the FCC, and lodge a petition with a circuit court. Further, the observer might suppose that a district court neglects the Article III duty to "say what the law is" by sitting idly in response to a claim that an agency clearly misinterpreted a statute or clearly exceeded delegated authority. But the observer would suppose wrongly.

*Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1120 (11th Cir. 2014), holds that the Hobbs Act not only eliminates the district court's jurisdiction to review a final order of the FCC but eliminates the jurisdiction of the district court to issue any ruling that has "the practical effect" of contradicting or countermanding a final order of the FCC. Under *Mais*, the district court lacks jurisdiction in private litigation "to consider claims to the extent they depend on establishing that all or part of an FCC order subject to the Hobbs Act is 'wrong as a matter of law' or is 'otherwise invalid.'" *Mais*, 768 F.3d at 1120 (quoting *Self v. Bellsouth Mobility, Inc.*, 700 F.3d 453, 462 (11th Cir. 2012). Under *Mais*, a private litigant accused of conduct violative of a final order interpreting the TCPA has no recourse other than "to ask the Commission to reconsider its interpretation" or apply to the FCC for a retroactive waiver or to petition the FCC to rescind the rule. *Mais*, 768 F.3d at 1121.

Bound by *Mais* and *Self*, the district court must dutifully comply with the prohibition against considering any contention that a final order "is wrong as a matter of

- 11 -

law" or "is otherwise invalid" and decline to consider even a challenge that a final order of the FCC results in an unconstitutional application of the TCPA. *See Woods v. Santander Consumer USA Inc.*, No. 2:14-CV-02104-MHH, 2017 WL 1178003, n.8 (N.D. Ala. Mar. 30, 2017) (Haikala, J.); *Drake v. FirstKey Homes, LLC*, 439 F. Supp. 3d 1313, 1328 n.6 (N.D. Ga. 2020) (May, J.); *see also Greenley v. Laborers' Int'l Union of N. Am.*, 271 F. Supp. 3d 1128, 1149 (D. Minn. 2017) (Wright, J.).

But this rule might end soon. In a unanimous concurrence, *Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094 (11th Cir. 2019), marshals formidable authority criticizing the rule announced in *Mais* and *Self* (and in other circuits) and concludes that these decisions either misinterpret the Hobbs Act or fail to confront the serious questions presented by a statute that strips the district court of the power to issue a ruling in private litigation that "countermand[s]" the FCC. First, *Gorss* reasons that by committing to the circuit courts the "exclusive jurisdiction" to "enjoin, set aside, suspend," or "determine the validity" of a final order of the FCC, the Hobbs Act prevents a district court's enjoining or vacating a final order of the FCC but does not limit a district court's interpreting the TCPA as applied in litigation between private parties. *Gorss*, 931 F.3d at 1107. *Gorss* invokes Justice Kavanaugh's concurrence in *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051 (2019), which reasons:

> [A] court "determines the validity" of the order only by entering a declaratory judgment that the order is valid or invalid. Critically, if a district court in an enforcement action disagrees with the agency interpretation, the district court does not issue a declaratory judgment or an injunction against the agency.

> Rather, the district court simply determines that the defendant is not liable under the correct interpretation of the statute. In other words, in an enforcement action, a district court does not determine the validity of the agency order.

*Gorss*, 931 F.3d at 1108.

Second, *Gorss* explains that the interpretation of the Hobbs Act advanced in *Mais* and *Self* (and in other circuits) presents constitutional doubts under Article III and the Due Process Clause. *Gorss* cites Justice Thomas's concurrence in *PDR Network*, which reasons persuasively, "If the [Hobbs] Act truly 'precluded the district court from even reaching' the text of the TCPA and instead required courts to treat 'FCC interpretations of the TCPA' as authoritative, . . . then the Act would trench upon Article III's vesting of the 'judicial Power' in the courts." And *Gorss* cites Justice Kavanaugh's concurrence in *PDR Network*, which reasons persuasively that "barring defendants in as-applied enforcement actions from raising arguments about the reach and authority of agency rules enforced against them raises significant questions under the Due Process Clause." Although *Gorss* persuades that *Mais* and *Self* incorrectly interpret the Hobbs Act (or correctly interpret the Hobbs Act but fail to confront the act's contingent unconstitutionality), *Gorss* confirms that *Mais* and *Self* govern in the Eleventh Circuit.

b.  Regulation of commercial speech

But even if the Hobbs Act (as interpreted by *Mais* and *Self*) permits VantagePoint's challenge, VantagePoint presents no persuasive argument that the requirement of "prior express *written* consent" imposes on speech a restriction triggering

strict scrutiny. Of course, the requirement of prior express *written* consent for "telemarketing" and "advertising" imposes on speech a restriction based on content, but the restriction remains permissible because the restriction comports with the distinction under the First Amendment between commercial speech, such as telemarketing and advertising, and non-commercial speech, such as political or religious speech.

Commercial speech is "expression related solely to the economic interests of the speaker and its audience" and enjoys "lesser protection" than "other constitutionally guaranteed expression." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980). Because of commercial speech's "subordinate position in the scale of First Amendment values," the government enjoys an "ample scope of regulatory authority" over commercial speech. *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989). Under *Central Hudson*, a restriction on truthful commercial speech about a lawful activity is subject to "intermediate scrutiny," which requires that the restriction advance a substantial government interest by means not more extensive than necessary. *Cent. Hudson*, 447 U.S. at 566.

The Supreme Court has occasionally asserted (broadly and in dicta) that any content-based restriction on speech is subject to strict scrutiny. *See, e.g.*, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 156 (2015) ("A law that is content-based on its face is subject to strict scrutiny"); *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335 (2020) ("Content-based laws are subject to strict scrutiny."). Of course, any law that treats commercial speech less favorably than other speech constitutes a content-based restriction on speech because such a law "'on its face' draws distinctions based on the

message a speaker conveys." *Reed*, 576 U.S. at 156. But none of these decisions suggest an intent to displace the rule of *Central Hudson*.

In *Reed*, a municipal sign ordinance imposed a hierarchy of requirements, that is, imposed requirements on the directional signs of a church, requirements that differed from the requirements imposed on political signs and those — again different — imposed on ideological signs. *Reed*, 576 U.S. at 164. Finding the ordinance "content based on its face," *Reed* subjected the ordinance to strict scrutiny. Although broadly stating that "[a] law that is content based on its face is subject to strict scrutiny," *Reed*, 576 U.S. at 165, *Reed* analyzed religious speech, political speech, and ideological speech — the "speech at the heart of the First Amendment," *Recht v. Morrisey*, 32 F.4th 398, 409 (4th Cir. 2022). Thus, *Reed* "never needed to mention commercial speech in that vein." *Recht*, 32 F.4th at 409. "Rather than overruling long-settled precedent, *Reed* simply concerned a totally different context; it cannot be distorted to so unsettle the *Central Hudson* regime." *Recht*, 32 F.4th at 409 ("'[T]he Supreme Court 'does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.'") (quoting *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000)).

And in *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335 (2020) (*AACP*), a plurality applies strict scrutiny to a 2015 amendment of the TCPA that exempts from liability a person attempting to collect a government debt. Because under the exemption the collector of a government debt can "robo-call" with impunity but a political group, for example, cannot, *AACP* reasons that the government-debt

exemption warrants strict scrutiny because the exemption prefers governmental and commercial speech to political and other non-commercial speech. But the restriction challenged in this action is the opposite: the heightened requirement of "prior express *written* consent" applies to commercial speech (telemarketing and advertising) and the lessened requirement of "prior express consent" applies to other speech. That is, *AACP* subjects to strict scrutiny a requirement preferring commercial or government speech to other speech, but the consent requirement challenged in this action permissibly prefers other speech to commercial speech. Although broadly stating that "[c]ontent-based laws are subject to strict scrutiny," *AACP*, 140 S. Ct. at 2346, *AACP* distinguishes "impermissible content-based speech restrictions from traditional or ordinary economic regulation of commercial activity that imposes incidental burdens on speech" and disavows any "expan[sion] [of] existing First Amendment doctrine or to otherwise affect traditional or ordinary economic regulation of commercial activity." *Barr*, 140 S. Ct. at 2347; *see also Recht*, 32 F.4th at 409 (recognizing that *Barr* neither overrules nor supplants *Central Hudson*).

A restriction on commercial speech is subject to intermediate scrutiny only, and VantagePoint advances no argument that the FCC's requirement of prior express *written* consent fails intermediate scrutiny. Thus, VantagePoint's constitutional argument — even if cognizable despite the Hobbs Act — fails.

III.    The merits challenge

On the merits, VantagePoint argues that the pre-recorded voicemails are not "telemarketing" and for that reason escape the 2012 FCC order's heightened

- 16 -

requirement of prior express *written* consent. The FCC at 47 C.F.R. § 64.1200(f)(13) defines "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." Even if offering nothing for sale, a call constitutes telemarketing if a "purpose" of "initiating" the call is to promote a sale. *Golan v. Veritas Ent., LLC*, 788 F.3d 814 (8th Cir. 2015). In *Golan*, the plaintiff received an unsolicited voicemail message stating, "Liberty. This is a public survey call. We may call back later." Although the voicemail message offered nothing for sale, the record in *Golan* revealed that the caller employed the survey to screen for consumers likely to watch a film produced by the caller. Unlike an "advertisement," which depends solely on the "content of the call[]," *Golan* reasons that for "telemarketing":

> [n]either the TCPA nor its implementing regulations "require an explicit mention of a good, product, or service" where the implication of an improper purpose is "clear from the context." Chesbro v. Best Buy Stores, L.P., 705 F.3d 913, 918 (9th Cir.2012). Congressional findings indicate that consumers consider "prerecorded calls, regardless of the content [of the] message, to be a nuisance and an invasion of privacy." See TCPA of 1991, Pub.L. No. 102–243, 105 Stat. 2394, § 2(10). Even when the intended content of a message is not conveyed, the intrusion into the home and the "seizure" of the phone line is the same. Id. § 2(5). [. . .] "Telemarketing" occurs when the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services."

*Golan*, 788 F.3d at 820 (citations omitted). Accordingly, *Golan* finds the voicemail messages "telemarketing" because the "survey calls" served principally to promote the sale of tickets for a film. G*olan*, 788 F.3d at 820.

- 17 -

*Eldridge v. Pet Supermarket Inc.*, 446 F. Supp. 3d 1063 (S.D. Fla. 2020) (Williams, J.), finds that a pet store's texts promoting an adoption event constitute telemarketing — even though the text offered nothing for sale — because a purpose of the text is to encourage attendance at the adoption event and a purpose of the adoption event is to promote the sale of the pet store's products and services. In other words, *Eldridge* holds that if a purpose of a call is to promote attendance at an event and a purpose of the event is to promote the sale of the caller's product or service, the call constitutes telemarketing.

Similarly, *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharmacies, Inc.*, 847 F.3d 92 (2d Cir. 2017), analyzes the TCPA's analogous prohibition against an unsolicited fax and finds that an invitation to attend a free seminar implies "the commercial purpose of promoting [the seller's] products or services" because "[b]usinesses are always eager to promote their wares and usually do not fund presentations for no business purposes."

The record reveals no dispute that VantagePoint's purpose in sending the fifteen pre-recorded voice messages is to promote participation in VantagePoint's training webinars. And the record permits the inference that a purpose of the training webinars is to promote VantagePoint's "artificial intelligence" software. First, some of VantagePoint's voice messages acknowledge that attendees to the webinar receive a "free trial" of VantagePoint's trading platform, and a "free trial" presumes the existence of a paid version. Second, Weister cites a YouTube video in which a VantagePoint "coach" explains VantagePoint's program and offers VantagePoint's

products for sale through a hyperlink.  Third, Weister cites Better Business Bureau reviews explaining that at the end of VantagePoint's training webinar a coach attempts to sell VantagePoint's program.  The material marshalled by Weister to oppose VantagePoint's motion for summary judgment — far from incontrovertible but reinforced by the timeless observation that "[t]here ain't no such thing as a free lunch" —supports the inference that the pre-recorded voicemails constitute telemarketing for which VantagePoint lacks Weister's prior express *written* consent.[2]

The motion (Doc. 29) for summary judgment is **DENIED**.  Not later than **AUGUST 18, 2022**, the parties must submit a revised case management report.

ORDERED in Tampa, Florida, on August 3, 2022.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

---

[2] An order, for example, resolving a dispositive motion after the completion of discovery might reject Weister's material as inadmissible or constituting no more than a scintilla of evidence or both. Under Rule 26, Federal Rules of Civil Procedure, Weister can propound interrogatories and requests for admission, depose witnesses, request documents, and the like. A failure to fruitfully employ Rule 26 to develop the record on the telemarketing claim might result in an order granting a dispositive motion after the close of discovery.